GILMAN, J., delivered the opinion of the court, in which BOGGS, J., joined. CLAY, J. (pp. 593-99), delivered a separate dissenting opinion.
OPINION
RONALD LEE GILMAN, Circuit Judge.
Anita Loyd, an African-American woman, worked as a security guard for 25 years at Saint Joseph Mercy Oakland/Trinity Health Hospital in Pontiac, Michigan before being terminated in July 2011 following an incident with an agitated and combative patient. Loyd was 52 years old at the time of her termination. She alleges that the hospital fired her because of her age, race, and sex, whereas the hospital contends that she was discharged for a major violation of hospital policy. The district court granted the hospital’s motion for summary judgment on all of Loyd’s claims. For the reasons set forth below, we AFFIRM the judgment of the district court.
I. BACKGROUND
Although Loyd had been employed as a security guard at the hospital since 1986, her disciplinary record was not unblemished. In 2001, for example, Loyd received a written warning for failing to help restrain a patient under circumstances very similar to the 2011 incident that led to her discharge; i.e., she questioned the authority of the medical staff to have the patient restrained. The record also shows that Loyd received a written warning in 2004 for refusing to work overtime hours.
Two more incidents involving Loyd occurred in 2010. In the first incident, Loyd left work due to illness without first obtaining permission from her supervisor, which constitutes a minor infraction under the hospital’s discipline policy. The second incident involved Loyd abandoning her post without excuse or permission, which is a major infraction under the hospital’s policy. In that incident, Loyd was found sitting on the porch of a house near the hospital while on duty. Loyd admitted to the underlying conduct, but claimed that her intent was to connect with the surrounding community. The hospital placed Loyd on final-written-warning status following this second 2010 incident.
Loyd and the hospital disagree on the details of the June 2011 incident that led to her termination. According to the hospital, Loyd was dispatched on June 16, 2011 to a room containing a female psychiatric patient. The patient was agitated and combative, and the medical staff needed *585 help in restraining her. But instead of helping to restrain the patient, Loyd asked the patient why she was in the hospital. Loyd told the patient that she could leave the hospital if she had been admitted for a drug-related or alcohol-related (as opposed to a psychiatric) reason.
Mark Bott, one of the nurses on duty, then began to argue with Loyd. Loyd maintained that drug-related and alcohol-related admissions were different from psychiatric-based admissions. She also demanded to see the patient’s admissions paperwork in order to determine whether the patient had been “petitioned and certified” (a hospital term for “involuntarily admitted”). Loyd’s actions exacerbated the patient’s condition to the point where the patient tried to pull an IV out of her own arm. Two other security guards, Pete Kowalak and David Sikorski, eventually succeeded in restraining the patient. Loyd made no attempt to help Kowalak or Sikorski.
Although Loyd concedes that the June 16, 2011 incident occurred, she disputes the hospital’s version regarding a number of the details. Loyd admits that she talked to the patient and told the patient that she (Loyd) would find out from the medical staff whether the patient could leave. She further admits that she walked out of the patient’s room and asked a nurse, Sonya Moak, whether the patient had been petitioned and certified. Loyd denies, however, that she failed to help restrain the patient. She also denies that the patient became more combative as a result of Loyd’s actions.
Following the incident, the hospital began an internal investigation. Moak drafted and filed an incident report with the hospital’s Potential Error Event Reporting System (PEERS), which is a part of the hospital’s quality-assurance review system. Ryan Hernandez, the hospital’s human-resources representative, then took statements from witnesses. Two of the witness statements were provided by Kowalak and Sikorski. Kowalak’s statement, dated June 20, 2011, explained that
[w]hen I arrived on this call I observed that ... Loyd was discussing the patient’s situation. She stated that there was no petition ordered. I also heard ... Loyd state to the E.R. staff that coming to the ER for drugs or phsych [sic] problems were two different things[,] at this time writer [Kowalak] had stepped out of the room.
Sikorski’s statement, dated June 17, 2011, recounted further details:
Upon my arrival to E.R. 19, Anita Loyd was already in the room, talking with the patient. Also in the room were R.N. Mark Bott and one other person whom I don’t know. At one point I overheard Loyd tell the patient that she did not have to stay if she did not want to. Loyd went on to ask the patient, “What you in here for?” The patient replied that she “had a problem with drugs.” Loyd then went and made a statement, “Drugs and alcohol is different than psych.” “You can’t keep her here, she can sign herself out.” Bott was obviously agitated by these remarks and told Loyd, “You can’t tell her that.” “She has to stay.” “You have no business talking to her.” “She has a petition against her.” The patient then demanded to see the petition. R.N. Moak was. now standing at the room door and said to the patient, “Let me get it.” Moak left the area and came back with the patients [sic] chart. Moak did not see the petition on the chart. Moak then got on the phone and asked someone if the patient was petitioned. Moak hung up the phone and stated that the social worker had signed a petition and that the patient was “unable” to leave. The *586 patient then became upset and stated that she was leaving. The patient then grabbed her I.V. and tried to pull it out of her hand. Bott then grabbed the patient and prevented her from pulling out the I.V. Bott pushed the patient down onto the bed and started to put on the restraints. At this time, Kowalak and I assisted Bott in restraining the patient. Loyd did not assist in the restraint. After the patient was restrained, Kowalak and I left the room. Loyd stayed in the room with the patient.
Hernandez also obtained statements from Bott and Moak about the incident. Both statements confirmed that Loyd had questioned whether it was proper to restrain the patient. Bott, however, did not sign his statement until August 2011. The hospital claims that “because Bott works midnights and Hernandez worked days, Hernandez was unable to obtain Bott’s signature ... until weeks later.”
Moak’s statement is also dated in August 2011. The hospital states that Hernandez interviewed Moak twice (once immediately after the incident and once in preparation for an August 2011 grievance hearing), but that Hernandez recorded only the date of the later interview.
Hernandez eventually prepared a summary of the internal investigation that contained witness statements from Bott, Kowalak, Loyd, Moak, and Sikorski. The summary also contained a five-line excerpt from the PEERS report that Moak had drafted. That excerpt stated the following:
Nurse requested Security to restrain a “Pit & Certed” patient. Patient becoming agitated and verbally threatening (threatening to leave and threatening to stab staff). Anita tried to deescalate patient. Patient wanted to see petition and stated she came here to stop using drugs. Anita told patient that she could leave if she wasn’t suicidal and stated to Nurse that patients that are here for drugs and alcohol are not Psych patients.
Steve Kazimer and Greg Williams, who were Loyd’s supervisors, decided to terminate Loyd’s employment on July 1, 2011 after reviewing the results of the internal investigation. The discharge notice explained that Loyd had
acted outside the scope of [her] duties and advised a patient incorrectly about the patient’s ability to leave the premises. This behavior exacerbated the patient’s behavior in a negative manner that resulted in the patient attempting to pull I.V. out & required [hospital] staff to place the patient in restraints. This is a major infraction [and a] violation of the employee discipline policy. Plaintiff is currently on a Final Written Warning therefore this infraction results in discharge from employment effective today 7/1/11.
Loyd subsequently filed a union grievance challenging her termination. The hospital denied the grievance at Step 8 of the grievance-adjustment process mandated by the Collective Bargaining Agreement (CBA) between the hospital and Loyd’s union, and upheld Loyd’s termination. Following this action by the hospital, the union notified the hospital in writing that it was declining to arbitrate the grievance because “the Union decidedf,] based upon the facts and evaluation of the likelihood of success on the merits of the case, that it was unlikely that ... arbitration would result in the reinstatement of Ms. Loyd.”
The hospital posted an advertisement for Loyd’s position on July 21, 2011. Although the position was originally offered to a Caucasian man, the man declined the *587 hospital’s offer. The hospital then hired a 39-year-old African-American woman to fill Loyd’s position in November 2011.
Loyd, for her part, filed a charge of discrimination with the Equal Employment Opportunity Commission and the Michigan Department of Civil Rights in September 2011. In her charge, Loyd alleged that the hospital had terminated her employment because of her age, race, and sex. The EEOC dismissed the charge and issued Loyd a right-to-sue letter in March 2012. Loyd then filed suit against the hospital and five hospital employees (Bott, Hernandez, Kazimer, Sikorski, and Williams) in June 2012.
During the course of discovery, Loyd filed a motion to compel the production of certain evidence. One piece of evidence sought in the motion was the PEERS report. Another was a surveillance video that allegedly contained a recording of the area outside the psychiatric patient’s room on June 16, 2011. Loyd argued to the district court that both pieces of evidence were “crucial to show that the reasons stated for her termination ... had no basis in fact and were fabricated.”
In its response to Loyd’s motion to compel, the hospital contended that the PEERS report was privileged (and therefore not discoverable) under Michigan law. Moreover, the hospital explained that the surveillance video had been overwritten 30 days after the incident occurred pursuant to the hospital’s routine practice of doing so after 30 days.
Loyd responded that the hospital had waived any privilege by including the five-line excerpt of the PEERS report in materials that the hospital had filed with the EEOC (the five-line excerpt appeared in Hernandez’s summary of the internal investigation). She also urged the district court to impose sanctions against the hospital for its failure to preserve the surveillance video. Loyd sought in particular a sanction that would exclude any testimony from the hospital’s witnesses about the incident.
Following a hearing on Loyd’s motion to compel, the district court denied the motion in March 2013. The court concluded that (1) the PEERS report was privileged under Michigan law, and (2) the hospital had not waived the privilege by filing the five-line excerpt of the PEERS report with the EEOC. It also declined to issue sanctions against the hospital, explaining that Loyd “may [instead] be entitled to a jury instruction that the jury may draw an inference adverse to the culpable party from the absence of evidence.”
The hospital then filed a motion for summary, judgment on all of Loyd’s claims. After a hearing, the district court granted the motion and entered judgment in favor of the hospital, holding that Loyd could not establish a prima facie case of age, race, or sex discrimination because Loyd could not demonstrate that she was qualified for the security-guard position. It based this determination on the conclusion that Loyd had failed to perform her job at a level that met the hospital’s legitimate expectations.
Moreover, even if Loyd could establish a prima facie case of discrimination, the district court held that Loyd could not show that the hospital’s proffered reason for firing her was a pretext intended to disguise unlawful discrimination. The district court also dismissed Loyd’s Michigan common-law claims (intentional interference with a contractual relationship and intentional infliction of emotional distress) on the ground that both claims were preempted by the Labor Management Relations Act (LMRA), 29 U.S.C. § 185(a), which “ ‘preempts state law rules that substantially implicate the meaning of the collec *588 tive bargaining agreement terms.’ ” Loyd v. St. Joseph Mercy Oakland/Trinity Health SJMO Pub. Safety Dep’t, No. 12-12567, 2013 WL 4805751, at *7 (E.D.Mich. Sept. 9, 2013) (quoting DeCoe v. Gen. Motors Corp., 32 F.3d 212, 216 (6th Cir.1994)).
This timely appeal by Loyd followed. In her appeal, Loyd contends that the district court committed reversible error in denying her motion to compel and in dismissing her claims at the summary judgment stage of the case.
II. ANALYSIS
A. Standard of review
We review a district court’s discovery-related rulings under the highly deferential abuse-of-discretion standard. B & H Med., LLC v. ABP Admin., Inc., 526 F.3d 257, 268 (6th Cir.2008). An abuse of discretion will not be found unless (1) the district court’s decision is predicated on an erroneous conclusion of law, (2) the district court’s factual findings are clearly in error, or (3) the district court’s decision is, when taken as a whole, “clearly unreasonable, arbitrary or fanciful.” Toth v. Grand Trunk R.R., 306 F.3d 335, 343 (6th Cir.2002) (internal quotation marks omitted).
In contrast, we review de novo a district court’s grant of summary judgment. Kalich v. AT & T Mobility, LLC, 679 F.3d 464, 469 (6th Cir.2012). Summary judgment is appropriate if the record, when viewed in the light most favorable to the nonmovant, reveals that no genuine dispute of material fact exists and that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a). A genuine dispute of material facts exists if “there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.” Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In reviewing a grant of summary judgment, we accept all of the nonmovant’s evidence as true and draw all reasonable inferences in the nonmovant’s favor. Id. at 255, 106 S.Ct. 2505.
B. The district court did not err in denying Loyd’s motion to compel and her request for sanctions
Loyd first attacks the district court’s denial of her motion to compel and her request that the hospital be sanctioned for its alleged discovery violations. We discern no error in the district court’s discovery order. Although Loyd argues that the PEERS report is not privileged under Michigan law because the privilege does not extend to reports involving the actions of hospital security guards, this argument has no merit. Michigan courts have construed the hospital-peer-review privilege (which is codified at M.C.L. § 333.21515) to encompass reports involving staff members who are not physicians or nurses. See Ligouri v. Wyandotte Hosp. & Med. Ctr., 253 Mich.App. 372, 655 N.W.2d 592, 594-95 (2002) (analyzing the statute and holding that peer-review reports discussing the alleged negligence of an unknown staff member were privileged in a case involving a patient who tripped and fell on a fan cord).
Nor did the district court commit reversible error in holding that the hospital had not waived the privilege. Although a party may not use an applicable privilege as both a sword and a shield, cf. Ross v. City of Memphis, 423 F.3d 596, 604 (6th Cir.2005) (involving the attorney-client privilege), Loyd has not shown that she suffered any prejudice as a result of the inclusion of the short excerpt. The PEERS summary included in Hernandez’s report revealed nothing more than the information contained in the witness state *589 ments. Accordingly, her argument regarding the hospital’s alleged waiver of its privilege fails because the excerpt’s inclusion did not harm Loyd’s case in any material way.
Finally, the district court did not err in declining to impose the sanctions urged by Loyd for the hospital’s failure to preserve the surveillance video. Loyd concedes in her brief that the district court was not required to exclude testimony from the hospital’s witnesses (which is what she asked the district court to do) even if the court believed that sanctions were warranted. And the district court did not reject Loyd’s sanctions argument outright. It instead explained that Loyd might be entitled to an adverse-inference jury instruction at trial. Our caselaw gives district courts wide latitude to fashion appropriate remedies for discovery violations, Bentkowski v. Scene Magazine, 637 F.3d 689, 697 (6th Cir.2011), and the district court did not abuse that discretion here by effectively taking the adverse-inference-instruction issue under advisement.
C. The district court did not err in granting summary judgment on Loyd’s race- and sex-discrimination claims
We now turn to the district court’s grant of summary judgment on Loyd’s race- and sex-discrimination claims. Because Loyd offered only circumstantial evidence of discrimination at the district-court level, the familiar McDonnell Douglas burden — shifting framework governs Loyd’s federal and state-law claims of race and sex discrimination. See Wright v. Murray Guard, Inc., 455 F.3d 702, 706-07 (6th Cir.2006) (applying the burden-shifting framework to Title VII race- and sex-discrimination claims); Hein v. All Am. Plywood Co., 232 F.3d 482, 488 (6th Cir. 2000) (holding that the framework applies to claims under Michigan’s Elliott-Larsen Civil Rights Act (ELCRA)).
Loyd has the burden of establishing a prima facie case of discrimination under the burden-shifting framework. Wright, 455 F.3d at 707. To do so, she must show that (1) she is a member of a protected class, (2) she suffered an adverse employment action, (3) she was qualified for the position, and (4) she was replaced by someone outside the protected class or treated differently from similarly situated, non-protected employees. Id.
The hospital does not dispute that Loyd established the first two elements of a prima facie case of race and sex discrimination. We will defer any discussion of the third element (see below) because the fourth element is dispositive. With regard to this fourth element, the district court noted in its summary judgment order that Loyd had failed to put forward any evidence that she was treated differently or less favorably than similarly situated hospital employees outside of the protected classes. Furthermore, the record shows that Loyd was replaced by an African-American woman. Loyd thus failed to establish a prima facie case of either race or sex discrimination.
D. The district court did not err in granting summary judgment on Loyd’s age-discrimination claims
Turning now to Loyd’s claims of age discrimination under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621, and ELCRA, Mich. Comp. Laws Ann. § 37.2101, the district court granted summary judgment on those claims for two reasons. The district court first held that Loyd could not establish that she was qualified for the security-guard position, which was fatal to her pri-ma facie case. Second, the district court *590 concluded in the alternative that Loyd could not show that the hospital’s proffered reason for terminating her employment was pretextual. The district court’s first holding was erroneous, but its alternative holding was sound.
Under the McDonnell Douglas burden-shifting framework that governs age-discrimination claims, Geiger v. Tower Automotive, 579 F.3d 614, 622 (6th Cir. 2009), the requirement that a plaintiff establish a prima facie case of age discrimination is not intended to be an onerous one. Cline v. Catholic Diocese of Toledo, 206 F.3d 651, 660 (6th Cir.2000) (characterizing the prima facie requirement as “not onerous”). Once a plaintiff has established a prima facie case of age discrimination, the burden shifts to the defendant employer to come forward with a legitimate, nondiscriminatory reason for the adverse employment action. Geiger, 579 F.3d at 626. The plaintiff then bears the burden of demonstrating that the proffered reason was in fact a pretext designed to conceal unlawful discrimination. Pretext can be shown by offering evidence that (1) the employer’s stated reason had no basis in fact, (2) the stated reason did not actually motivate the employer, or (3) the stated reason was insufficient to warrant the adverse employment action. Wexler v. White’s Fine Furniture, Inc., 317 F.3d 564, 576 (6th Cir.2003) (en banc).
The district court’s error in analyzing Loyd’s prima facie case of age discrimination stemmed from the court’s conflation of the qualification prong with the hospital’s proffered reason for terminating Loyd’s employment. We have repeatedly cautioned district courts against “consider[ing] the employer’s alleged nondiscriminatory reason when analyzing the prima facie case.” Id. at 574. Moreover, a plaintiff can satisfy the qualification prong by showing that she performed at a level that generally met her employer’s objective minimum qualifications. Id. at 575-76.
The district court in this case relied too heavily on the incident that caused Loyd’s termination in evaluating the qualification prong. Loyd had worked as a security guard at the hospital for 25 years before she was terminated in June 2011. This is compelling evidence that Loyd met the hospital’s objective minimum qualifications at the time of her termination, notwithstanding her previous negative performance reviews. See id. at 576 (explaining that the inquiry as to whether a plaintiff was qualified for a position “should focus on criteria such as the plaintiffs education, experience in the relevant industry, and demonstrated possession of the required general skills”). The district court erred by focusing on the hospital’s proffered reason for terminating Loyd rather than on Loyd’s objective qualifications for the security — guard position in evaluating her prima facie case.
Nevertheless, the district court did not err in granting summary judgment on Loyd’s age-discrimination claims. The court held in the alternative that Loyd could not demonstrate that the hospital’s stated reason for firing her was pretextual. In particular, the court relied on the “honest-belief rule” in so holding. As found by the court, “the evidence shows that Defendant terminated Plaintiff based on its honestly held belief, based on particularized facts, that she committed a major infraction while on final warning.” Loyd v. St. Joseph Mercy Oakland/Trinity Health SJMO Pub. Safety Dep’t, No. 12-12567, 2013 WL 4805751, at *6 (E.D.Mich. Sept. 9, 2013).
The honest-belief rule provides that an employer is entitled to “summary judgment on pretext even if its conclusion is later shown to be mistaken, foolish, trivi *591 al, or baseless.” Chen v. Dow Chem. Co., 580 F.3d 394, 401 (6th Cir.2009) (internal quotation marks omitted). An employer’s pre-termination investigation need not be perfect in order to pass muster under the rule. Seeger v. Cincinnati Bell Tel. Co., 681 F.3d 274, 285 (6th Cir.2012) (holding that an employer need not demonstrate that its investigation was “optimal or that it left no stone unturned”). The key inquiry is instead “whether the employer made a reasonably informed and considered decision before taking an adverse employment action.” Id. (internal quotation marks omitted). And to rebut an employer’s invocation of the rule, the plaintiff must offer some evidence of “an error on the part of the employer that is too obvious to be unintentional.” Id. at 286 (internal quotation marks omitted).
Loyd argues that the hospital’s proffered reason for firing her has no basis in fact. She notes, among other things, that two of the four witness statements taken in this case were not available to the hospital when it made its decision to terminate Loyd’s employment on July 1, 2011. But even if we assume that Loyd’s assertion is true, the two witness statements (Kowalak and Sikorski) that indisputably were available to the hospital in June 2011 show that Loyd acted in an insubordinate manner.
Kowalak’s statement, for example, reported that “Loyd state[d] to the E.R. staff that coming to the ER for drugs or phsych [sic] problems were two different things.” This statement by Loyd violated the hospital’s June 2010 directive that security guards “shall expect that medical personnel have made an assessment of the situation and adhere[d] to restrain[t] protocols prior to calling the officer.” Loyd has no formal medical training and it was not her job to question the reasons why a patient has been admitted to the hospital.
Similarly, Sikorski recounted that Loyd stated in the patient’s presence that “You can’t keep her here, she can sign herself out.” This is plainly insubordinate behavior by Loyd. Insubordination, moreover, is a major infraction under the hospital’s discipline policy irrespective of whether the insubordination poses an actual or potential threat of harm to the staff or the patient.
Loyd argues that we should view the discharge notice with skepticism. She specifically contends that an open question exists as to whether her actions actually exacerbated the psychiatric patient’s condition. But the answer to this question is ultimately irrelevant to the honest-belief analysis. See Chen, 580 F.3d at 401 (holding that an employer is entitled to summary judgment under the honest-belief rule “even if its conclusion is later shown to be mistaken”). The contemporaneous witness statements from Kowalak and Si-korski corroborate the substance of the discharge notice. And the hospital was well within its rights to fire Loyd given that (1) she was on final-written-warning status in June 2011, and (2) she had committed a major infraction insofar as she failed to abide by the hospital’s directive that security guards “shall expect that medical personnel have made an assessment of the situation and adhere[d] to restrain^] protocols prior to calling the officer.”
In sum, the hospital took witness statements and made a reasonable assessment of the available evidence before terminating Loyd. The law does not require the hospital to do anything more. See Seeger, 681 F.3d at 285 (stating the rule than an employer need not prove “that it left no stone unturned”). To require otherwise would unduly frustrate an employer’s ability to terminate insubordinate employees for legitimate, nondiscriminatory reasons.
*592 Nor has Loyd offered any evidence of “an error on the part of the [hospital] that is too obvious to be unintentional.” See id. at 286 (internal quotation marks omitted). The evidence in fact demonstrates just the opposite because Loyd had already received a written warning following a similar incident in May 2001 and was on final-written-warning status for a major infraction in 2010. Loyd has simply offered no evidence to rebut the hospital’s honestly held belief that Loyd committed a major infraction on June 16, 2011, and this lack of evidence dooms Loyd’s age-discrimination claims.
E. The district court did not err in granting summary judgment on the Michigan common-law claims
Finally, Loyd argues that her Michigan common-law claims of intentional interference with a contractual relationship and intentional infliction of emotional distress should have been submitted to a jury. The district court granted summary judgment on both claims, holding that they were preempted by the LMRA.
Section 301 of the LMRA preempts “state law-based actions [that are] inextricably intertwined with consideration of the terms” of a CBA. Mattis v. Massman, 355 F.3d 902, 905 (6th Cir.2004) (internal quotation marks omitted). Preemption under § 301 of the LMRA applies not only to contract-based claims, but also to state-law tort claims. Id. To decide whether a state-law claim is preempted by the LMRA, we perform a two-step inquiry. The first step requires us to determine “whether resolving the state-law claim would require interpretation of the terms” of the CBA. Id. at 906. If interpretation of the CBA would be required, then the state-law claim is preempted and the inquiry is at an end. Id. The second step involves ascertaining “whether the rights claimed by the plaintiff were created by the [CBA], or instead by state law.” Id. If the rights were created by the CBA, then the state-law claim is preempted. Id.
Here, Loyd’s claim of intentional interference with a contractual relationship is based on the hospital’s alleged failure to “honor and perform its contractual obligations” under the CBA. This claim is accordingly preempted by § 301 of the LMRA because it asserts “a right created not by state law,” but instead created by the CBA between the hospital and Loyd’s union. See Mattis, 355 F.3d at 907 (holding that a Michigan common-law claim of tortious interference with a business relationship was preempted by § 301). The district court, therefore, did not err in its preemption analysis of the intentional-interference claim.
As for Loyd’s claim of intentional infliction of emotional distress, we need not wade into the preemption question because run-of-the-mill claims of employment discrimination (as are alleged here) do not constitute extreme and outrageous conduct sufficient to state a claim of intentional infliction of emotional distress under Michigan law. See Hartleip v. McNeilab, Inc., 83 F.3d 767, 777 (6th Cir.1996) (holding that a wrongful discharge, without more, does not provide a sufficient basis for such a tort claim under Michigan law). Because we may affirm a grant of summary judgment on any ground supported by the record, Freeze v. City of Decherd, 753 F.3d 661, 664 (6th Cir.2014), summary judgment on Loyd’s claim of intentional infliction of emotional distress was proper.
III. CONCLUSION
For all of the reasons set forth above, we AFFIRM the judgment of the district court.