**NOT RECOMMENDED FOR PUBLICATION**
File Name: 17a0376n.06

**No. 16-4057**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

|  |  |  |
|---|---|---|
| WYLIE & SONS LANDSCAPING, LLC, | ) | **FILED**<br>Jun 27, 2017<br>DEBORAH S. HUNT, Clerk |
| Plaintiff-Appellant, | ) | |
| v. | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO |
| FEDEX GROUND PACKAGE SYSTEM, INC., | ) | |
| Defendant-Appellee. | ) | |

BEFORE: BOGGS, McKEAGUE, and GRIFFIN, Circuit Judges.

GRIFFIN, Circuit Judge.

Thomas Wylie, Sr., the majority owner of Wylie & Sons Landscaping, lost his son in a car accident in 2012 and believed a line-haul driver for FedEx Ground was responsible for the incident. Two years later, Wylie & Sons bid for a subcontract to work on a construction project at FedEx's Toledo facility. When FedEx learned of Wylie's involvement, it urged the primary contractor to terminate the agreement, citing security concerns over Wylie's past interactions with the line-haul driver. Plaintiff alleged FedEx's conduct amounted to tortious interference with a contract, but the district court disagreed and granted summary judgment in favor of defendant. Finding no error requiring reversal, we affirm the district court's judgment.

I.

Around 4:30 a.m. on June 23, 2012, Thomas Wylie, Jr. was traveling westbound in his truck on Route 24 in Henry County, Ohio. *See generally Wylie v. FedEx Ground Package Sys., Inc.*, 645 F. App'x 354 (6th Cir. 2016). Jonathan Shoemaker and Van Adams were also driving on Route 24, hauling their FedEx Ground tractor-trailers in the opposite direction. "Adams drove the lead truck, with Shoemaker drafting 200 to 300 feet behind him." *Id.* at 355. As he neared Adams and Shoemaker, Wylie, Jr. crossed the center line, sideswiping Adams's trailer. "The rear wheels on Wylie Jr.'s truck and Adams's tractor-trailer hooked each other, spinning Wylie Jr.'s truck into Shoemaker's path. Shoemaker's truck then crashed into Wylie Jr.'s pickup and killed him." *Id.*

Roughly a month after the accident, a distraught Wylie telephoned Adams using the contact information Adams gave to the police. Between midnight and 2:00 a.m., Wylie left Adams a series of "angry, threatening [voicemail] messages," including threats of physical violence and racial slurs. Wylie made it clear he blamed Adams for his son's death, "kn[e]w [Adams's] address," and would "come to [him]." Adams took the threats seriously. He obtained an ex parte order for protection against Wylie in Allen County, Indiana, and reported the incident to FedEx.

FedEx also took the threats seriously, assigning senior security specialist Kevin Talley to investigate the matter. Looking into Wylie's criminal history, Talley found past charges and arrests for felony assault, aggravated trespassing, and intimidation. He also learned other FedEx drivers were familiar with Wylie. One employee told Talley that Wylie had once allegedly been involved in manufacturing a bomb—although (according to Wylie) "the police cleared him on that and so did the jury." Talley reported his findings to supervisor Robert Bilek, who concluded

Wylie posed "a serious threat to the security of FedEx Ground" and its employees. At Bilek's direction, Talley implemented additional safety measures at FedEx, posting security guards at its Fort Wayne and Toledo facilities; issuing warnings and circulating Wylie's photograph; conducting a "security awareness session" with FedEx management; and recommending that line-haul drivers be re-routed off Route 24.

In 2013, Wylie sued Shoemaker, Adams, and FedEx, "alleging that both drivers were negligent, that their negligence caused Wylie, Jr.'s death, and that FedEx was responsible for their negligence." *Id.* While the case was pending, Wylie posted large, visible signs on his company's dump trucks referring to the "2 Fed Ex Semis" that "end[ed]" his son's life and implying that FedEx was "stalling" the Henry County Sheriff Department's resolution of the case. He also circulated flyers and placed an ad in a local newspaper that, although primarily intended to deride the Sheriff's Department, again implicated FedEx in the death of Wylie, Jr.

As it litigated the negligence case, FedEx began laying the groundwork for a construction project to expand its Toledo hub. It hired Rudolph/Libbe Inc. to perform the "Site Work" and serve as the construction manager for the project. Rudolph/Libbe subcontracted a portion of the site work to Wylie & Sons under a "zero-dollar, unit-price contract," meaning Rudolph/Libbe only had to pay plaintiff for the work it performed. The contract incorporated FedEx Ground's "Master Terms and Conditions for Subcontract Agreement," which gave Rudolph/Libbe the unilateral right to terminate its contract with Wylie & Sons "at any time," "without cause." At the time his company bid for the project, Wylie was still pursuing the negligence action and displaying the signs on his dump trucks. Rudolph/Libbe asked him to remove them before starting work on FedEx's property.

At some point, Bilek, who had supervised the 2012 investigation, learned Wylie & Sons would be involved in the construction. He contacted Paul Stritmatter, FedEx Ground's Managing Director of Protection and Preventative Services, to express his security concerns. Stritmatter shared Bilek's concerns and decided not to "take any chance[s]." He directed the engineer overseeing the project to tell Rudolph/Libbe to use another subcontractor. Rudolph/Libbe agreed. Approximately two weeks before Wylie & Sons began work on the site, Rudolph/Libbe informed Wylie it could not use his company's services. It subcontracted the work to another contractor at an additional expense to FedEx of more than $138,000.

After losing the project, Wylie & Sons sued FedEx Ground for tortious interference with a contract and tortious interference with a business relationship. Plaintiff alleged FedEx interfered with its relationship with Rudolph/Libbe "out of a spirit of spite, malicious purpose, and utter hatred" toward Wylie as the majority owner of the company. Following discovery, FedEx moved for summary judgment. Plaintiff opposed the motion and moved to strike portions of defendant's supporting affidavits. The district court resolved both motions in a single opinion and order, denying plaintiff's motion to strike and granting defendant summary judgment. Wylie & Sons timely appealed.[1]

## II.

## A.

"We review a district court's discovery-related rulings under the highly deferential abuse-of-discretion standard." *Ondo v. City of Cleveland*, 795 F.3d 597, 603 (6th Cir. 2015) (quoting *Loyd v. St. Joseph Mercy Oakland*, 766 F.3d 580, 588 (6th Cir. 2014)). "This includes our

---

[1]Plaintiff does not address its interference-with-a-business-relationship claim on appeal, and, accordingly, neither do we. *See White Oak Prop. Dev., LLC v. Washington Twp.*, 606 F.3d 842, 854 (6th Cir. 2010) ("[I]ssues not raised in appellate briefs are deemed waived." (citation and brackets omitted)).

review of a district court ruling on a motion to strike an affidavit." *Id.* "A district court abuses its discretion when it relies on erroneous findings of fact, applies the wrong legal standard, misapplies the correct standard when reaching a conclusion, or makes a clear error of judgment." *Id.* (internal quotation marks omitted).

Plaintiff argues that certain portions of Talley's, Bilek's, and Stritmatter's affidavits cannot be considered at summary judgment because they constitute hearsay and are not based on the affiant's personal knowledge. *See Hoover v. Walsh*, 682 F.3d 481, 491 n.34 (6th Cir. 2012) (noting that a court cannot rely on inadmissible hearsay at summary judgment where the hearsay cannot be "reduce[d] . . . to admissible form"); Fed. R. Civ. P. 56(c)(4) (stating that affidavits used to support motions for summary judgment "must be made on personal knowledge"). Neither claim has merit.

Hearsay is an out-of-court statement offered to prove the truth of the matter asserted. *See Mich. First Credit Union v. CUMIS Ins. Soc., Inc.*, 641 F.3d 240, 251 (6th Cir. 2011); Fed. R. Evid. 801(c). Wylie & Sons contends paragraphs 7, 11, and 13 of Talley's affidavit fit this definition. Paragraph 7 details the results of Talley's investigation into Wylie's criminal history, while paragraphs 11 and 13 consist of statements other FedEx employees made to Talley during his investigation—including the claim that Wylie "allegedly had made a bomb before and blew up his house or a neighbor's house." Plaintiff also disputes the admissibility of paragraph 5 of Bilek's affidavit, in which Bilek recalled investigating a "workplace violence report" and learning that "Mr. Wylie, Sr. intended to 'amp it up' on FedEx over the [December 2013] holiday season." The district court rejected both arguments. It concluded defendant offered the challenged statements not to prove the truth of the matters they asserted, but to "provide relevant

and probative evidence as to why FedEx believed the owner of Wylie & Sons, Thomas Wylie, Sr., posed a threat to FedEx."

"One of the key elements in a tortious interference claim is the question of whether a defendant's actions were privileged." *Super Sulky, Inc. v. U.S. Trotting Ass'n*, 174 F.3d 733, 742 (6th Cir. 1999) (citing *A & B-Abell Elevator Co. v. Columbus/Central Ohio Bldg. & Constr. Trades Council*, 651 N.E.2d 1283, 1294 (Ohio 1995)). "[E]ven if an actor's interference with another's contract causes damages to be suffered, that interference does not constitute a tort if the interference is justified." *Fred Siegel Co. v. Arter & Hadden*, 707 N.E.2d 853, 858 (Ohio 1999). The Ohio Supreme Court's decision in *Fred Siegel* sets out seven factors the courts consider in determining whether a defendant's interference is justified, the second of which is "the actor's motive." *Id.* at 860.

FedEx argued that its interference with the Rudolph/Libbe contract was justified based on these factors, citing Talley's and Bilek's affidavits not to prove the truth of the matter asserted, but to demonstrate that its motive "was entirely based on security." Talley and Bilek kept Stritmatter "very informed" of their investigation into Wylie's threats, his arrest history, and ongoing hostility toward FedEx Ground "in the form, among other things, of banners o[n] his trucks." Stritmatter testified that he "deal[s] with hundreds of workplace violence cases every year," yet Wylie's case "particularly stands out" to him. He was "extremely concerned" about Wylie and "wasn't going to take any chance[s]." Given what he learned from Talley and Bilek, Stritmatter believed requesting a different subcontractor was the best decision for the safety of FedEx Ground's employees and property, even if it cost the company an additional $138,000. Thus, the comments in Talley's and Bilek's affidavits go not to prove the truth of their assertions—i.e., that Wylie has a particular criminal history, or "allegedly . . . blew up his house

or a neighbor's house"—but to show their effect on Stritmatter and explain why defendant asked Rudolph/Libbe to hire a different subcontractor. *See Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 379 (6th Cir. 2009) ("A statement that is not offered to prove the truth of the matter asserted but to show its effect on the listener is not hearsay."); *see also Bush v. Dictaphone Corp.*, 161 F.3d 363, 366–67 (6th Cir. 1998) (employee comments stating the plaintiff was "abusive or unstable" and had "gone off the deep end" were admissible to show the non-discriminatory reasons for the employer's decisions to demote and then discharge the plaintiff).

Plaintiff's other argument—that Talley, Bilek, and Stritmatter lack personal knowledge of the facts mentioned in their affidavits—misunderstands the personal-knowledge requirement. For example, Wylie & Sons claims Talley "cited no facts to support [his] personal knowledge" of the information in paragraph 7, which summarizes the alleged charges and arrests in Wylie's criminal history. "Clearly," says plaintiff, Talley "possesses no[] facts to substantiate any of the alleged crimes," and "the validity of the arrests and charges . . . for which [Wylie] was not convicted is beyond [Talley's] personal knowledge." But plaintiff misconstrues the affidavit. Talley does not claim personal knowledge of whether these arrests or charges are valid; he claims personal knowledge of the fact that they are included in Wylie's criminal history. Further, Talley cites facts explaining the basis of his knowledge. He swears that "[i]n August 2012, [he] investigated Mr. Wylie Sr.'s criminal history." No doubt Talley has personal knowledge of the matters he personally investigated.[2]

---

[2]Plaintiff likewise disputes paragraph 2 of Talley's affidavit, stating "On July 30, 2012, I learned that a line-haul driver who drove trucks for FedEx Ground, Van Adams, was involved in a fatal[] accident and the victim's father had been calling Van Adams [and] leaving death threats." Plaintiff does not explain how Talley lacks personal knowledge of information he "learned."

The same goes for plaintiff's arguments regarding paragraphs 11 and 13 of Talley's affidavit and paragraph 5 of Bilek's affidavit, all of which refer to other employees' statements regarding Wylie. Talley and Bilek do not claim to know whether Wylie actually "intended to 'amp . . . up'" his campaign against FedEx in December of 2013, or whether he actually "made a bomb," as the statements profess. Instead, they claim personal knowledge of conversations with the FedEx employees who made these allegations. Both are therefore qualified to endorse affidavits recounting these statements.

Finally, in Stritmatter's case, Wylie & Sons complains his affidavit "provides for a legal conclusion when [it] states, 'Because Mr. Wylie, Sr. represented a security threat . . . to the people, employees and property of FedEx Ground, I decided that his company . . . should not be used on the FedEx Ground Project.'" Plaintiff is incorrect. This is not a legal conclusion; it is an opinion. Stritmatter has personal knowledge of his own opinions.

The district court did not rely on erroneous findings of fact, apply the wrong legal standard, misapply the correct legal standard, or render a clear error of judgment. *Ondo*, 795 F.3d at 603. Accordingly, it did not abuse its discretion in denying plaintiff's motion to strike.

### B.

We review the district court's grant of summary judgment de novo. *Keith v. Cty. of Oakland*, 703 F.3d 918, 923 (6th Cir. 2013). "Summary judgment is proper 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(a)). A dispute is "genuine" if the evidence permits a reasonable jury to return a verdict in favor of the nonmovant, and a fact is "material" if it may affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 248 (1986). Viewing the evidence in a light most favorable to the nonmoving party, our task is to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

To succeed on its claim of tortious interference with a contract, Wylie & Sons must demonstrate: (1) the existence of a contract; (2) FedEx's knowledge of the contract; (3) FedEx's intentional procurement of the contract's breach; (4) lack of justification; and (5) resulting damages. *Paramount Farms Int'l, LLC v. Ventilex B.V.*, 61 N.E.3d 702, 707 (Ohio Ct. App. 2016). The district court granted defendant summary judgment on this claim because plaintiff "stall[ed] on the third and fourth elements, breach and lack of justification." (R. 43, ID 782). We agree.

Under the "zero-dollar, unit-price" subcontract, Rudolph/Libbe was free to use Wylie & Sons as much or as little as it pleased, and only had to pay for the work plaintiff actually performed. And plaintiff did not perform any work. Rudolph/Libbe exercised its unilateral right to terminate the subcontract "at any time . . . without cause" approximately two weeks before construction began. The termination clause also warned Wylie & Sons that "[i]n no event shall Subcontractor be entitled to lost or anticipated profits on unperformed Work." FedEx acknowledges that Rudolph/Libbe acted at its direction. But "any interference with [an at-will contract] that induces its termination is primarily an interference with the future relation between the parties, and the plaintiff has no legal assurance of them. As for the future hopes he has no legal right but only an expectancy"; thus, "when the contract is terminated by choice of the third person[,] there is no breach of it." *Hoyt, Inc. v. Gordon & Assocs., Inc.*, 662 N.E.2d 1088, 1097 (Ohio Ct. App. 1995) (first alteration in original) (citation omitted).

Plaintiff evidently agrees. Instead of disputing the district court's no-breach finding, Wylie & Sons insists "it is not necessary . . . to prove . . . an actual breach" of the contract in order to establish FedEx's *interference* with the contract. Yet, Ohio's Supreme Court has said just the opposite: "We . . . hold that in order to recover for a claim of intentional interference with a contract, one must prove . . . the wrongdoer's intentional procurement of the contract's breach." *Kenty v. Transamerica Premium Ins., Co.*, 650 N.E.2d 863, 866 (Ohio 1995); *see also Fred Siegel*, 707 N.E.2d at 858 (reaffirming the elements announced in *Kenty*).

Plaintiff also contends that the at-will termination clause is irrelevant where the interfering party does not invoke the privilege of fair competition—a privilege FedEx Ground cannot invoke because it does not compete with Wylie & Sons in the construction industry. *See Ginn v. Stonecreek Dental Care*, 30 N.E.3d 1034, 1045 (Ohio Ct. App. 2015) (noting the "privilege of fair competition . . . will defeat a claim of tortious interference with [a] contract when a contract is terminable at will," and the interfering party is a market competitor). But regardless of privilege, tortious interference with a contract requires that there be a breach of a contract, and here, there was none. *See Fred Siegel*, 707 N.E.2d at 858. This fact alone justifies granting summary judgment in favor of defendant.

Nor do we agree with plaintiff's suggestion that FedEx must be an industry competitor in order to demonstrate that its interference was privileged. *See, e.g.*, *Paramount Farms*, 61 N.E.3d at 707–11 (examining the seven privilege factors in the context of a non-competitor defendant). What matters is whether the relevant *Fred Siegel* factors favor the interfering party, and, in this case, the district court reasonably concluded that they do. Plaintiff's arguments to the contrary minimize Wylie's conduct and do not warrant discussion. Nothing in Ohio's tortious-

interference case law compels FedEx to employ on its own property a company that sued it for negligence or an individual who admittedly threatened one of its line-haul drivers.

## III.

For the foregoing reasons, we affirm the district court's judgment.