NOT RECOMMENDED FOR PUBLICATION
File Name: 26a0197n.06

Case No. 25-1667

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED
May 01, 2026
KELLY L. STEPHENS, Clerk

|  |  |  |
|---|---|---|
| ONEKA SPICER, | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF MICHIGAN |
| HARVARD MAINTENANCE, INCORPORATED, | ) | |
| | ) | |
| Defendant-Appellee. | ) | O P I N I O N |
| | ) | |

Before: READLER, DAVIS, and BLOOMEKATZ, Circuit Judges.

DAVIS, Circuit Judge. Oneka Spicer appeals the district court's grant of summary judgment to her former employer, Harvard Maintenance, Inc., on her race discrimination, sex discrimination, and hostile-work-environment claims brought under Michigan law. She also appeals the court's denial of her motion to reconsider its summary judgment order. Because Spicer has failed to establish a genuine issue of material fact as to any of her claims, we **AFFIRM.**

**I.**

**A. Factual Background**

Oneka Spicer worked as a cleaner for Harvard Maintenance, Inc. ("Harvard"), a janitorial service company, at a multi-building complex in Michigan between 2017 and 2018.

Spicer, who is a woman of African American descent, worked in two buildings during her tenure at Harvard. Initially, she reported to site supervisor Melissa Irving. When a position

became available at a different building about six months later, Spicer transferred there. The second building was managed by site supervisor Chris Copeland, who is African American. According to Spicer, she asked Irving for the transfer because a tenant in the first building cursed at her and called her a racial slur. According to Harvard, the transfer was voluntary. Contemporaneous documents do not reflect the reason for the transfer.

During Spicer's time at Harvard, several commercial tenants in both buildings complained about her work. And Harvard issued multiple warnings advising her of these complaints. For instance, in October 2017, Spicer received a written reprimand explaining her "substandard" cleaning work. (Disciplinary Form, R. 59-5, PageID 1700). In July 2018, after Spicer transferred buildings, Harvard put her on a "strict cleaning schedule" designed to ensure that she thoroughly cleaned each area to which she was assigned and to "giv[e] [her] [a] chance[] to complete the job duties" correctly. (*Id.* at PageID 1701; Graham-Coltrane Dep., R. 59-1, PageID 1610). The following month, Spicer received another written reprimand for not following the cleaning schedule. When asked about these complaints during her deposition, Spicer did not recall receiving any complaints about the quality of her work and claimed to have never seen the written reprimands.

Spicer received a final reprimand in October 2018 after Copeland saw her sitting in a client's chair and charging her phone during a non-break period in her shift. He summoned Spicer to his office. Spicer says that she immediately went to Copeland's office; Harvard, however, maintains that Spicer disobeyed Copeland's directive. Copeland reported Spicer's behavior—including her failure to report to his office—to account manager Victoria Graham-Coltrane, who told him to suspend Spicer. Spicer was suspended pending a grievance meeting with a union representative.

Spicer's employment was governed by a Collective Bargaining Agreement ("CBA") and Harvard's internal rules. The CBA includes a just-cause and progressive-discipline provision that governs discharge procedures for "seniority" employees. To challenge a discharge as unjustified, an employee must follow the CBA's grievance procedures. Sometimes Harvard reaches a "Last Chance Agreement" ("LCA") with an employee, which allows them to continue working during a probationary period subject to immediate termination. Harvard also has its own workplace policy. It lists "major" violations that, if committed, "may subject an employee to an immediate discharge." (Work Rules, R. 59-7, PageID 1871). Examples include unauthorized use of customer property and refusal to heed supervisors' instructions. Repeated "minor" violations, such as poor performance, may also lead to termination. (*Id.* at 1872–73).

Spicer, Copeland, Graham-Coltrane, and a union representative convened at the scheduled grievance meeting. During the meeting, Spicer admitted that she violated company policy. And during her deposition, she acknowledged that the violations were "major." (Spicer Dep., R. 59-6, PageID 1789). Nonetheless, she asserts that she was dismissed because of race and sex discrimination. In partial support of her claims, Spicer points to her treatment during the grievance meeting. For instance, she says that, during the grievance meeting, Graham-Coltrane responded to the description of Spicer sitting in the tenant's chair by saying: "I wouldn't want her to sit in my chair either." (*Id.* at PageID 1773). And she asserts that Graham-Coltrane's description of Spicer's demeanor during the meeting as "unpleasant," "rude," "overly aggressive," "nonchalant," and "display[ing] no regard as to what happens with her job" traffics in racial stereotypes. (Graham-Coltrane Dep., R. 59-1, PageID 1619; Post-Meeting Email, R. 59-5, PageID 1705). For her part, Graham-Coltrane recalls that, when she explained that Spicer's behavior could result in termination, Spicer said: "I don't care." (Graham-Coltrane Dep., R. 59-2, PageID 1683).

Apparently recognizing the jeopardy into which Spicer's job had fallen, her union representative asked for an LCA to preserve Spicer's job. A few days after the grievance meeting, however, Graham-Coltrane rejected this request. Instead, she decided to terminate Spicer based on the severity of the infractions, Spicer's behavior at the grievance meeting, and her apparent disregard for her job. The union elected not to challenge Spicer's termination under the CBA.

### B. Procedural History

Spicer brought race discrimination, sex discrimination, and hostile-workplace-environment claims under Michigan's Elliott-Larsen Civil Rights Act ("ELCRA"), Mich. Comp. Laws § 37.2101 *et seq.* Harvard removed the action from state to federal court. After a period of discovery, Harvard moved for summary judgment. Spicer opposed it, and the district court granted the motion in full. *Spicer v. Harvard Maint., Inc.*, No. 20-10987, 2024 WL 2963766, at \*4 (E.D. Mich. June 12, 2024) (subsequent history omitted). Spicer filed a motion for reconsideration under Federal Rule of Civil Procedure Rule 59(e).[1] The court denied her request. Spicer filed this timely appeal.

### II.

We review the grant of summary judgment—and a subsequent order denying a Rule 59(e) motion to reconsider the summary judgment order—de novo. *Smith v. P.A.M. Transp., Inc.*, 154 F.4th 375, 382 (6th Cir. 2025); *Med. Mut. of Ohio v. k. Amalia Enters. Inc.*, 548 F.3d 383, 389–90 (6th Cir. 2008). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

---

[1] Spicer also invoked Eastern District of Michigan Local Rule 7.1(h). A 2021 amendment to that rule requires parties seeking reconsideration of a final order to file a motion under Federal Rule of Civil Procedure 59(e) or 60(b). *See Miller v. William Beaumont Hosp.*, 121 F.4th 556, 557 (6th Cir. 2024) (order). Therefore, we consider Spicer's filing as a Rule 59(e) motion.

56(a).  A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  While we "view[] all the evidence in the light most favorable to the nonmoving party," *Fisher v. Nissan N. Am., Inc.*, 951 F.3d 409, 416 (6th Cir. 2020), "[c]onclusory statements unadorned with supporting facts are insufficient to establish a factual dispute that will defeat summary judgment." *Viet v. Le*, 951 F.3d 818, 823 (6th Cir. 2020) (citation modified).

### III.

Spicer argues that the district court erred in granting Harvard's summary judgment motion because it misapplied the prima facie elements necessary to establish her claims.  Specifically, she contends that she was qualified for her job, and she presented sufficient evidence from which to infer discriminatory animus.  She also argues that the district court placed too much weight on the fact that her supervisor was African American.  And she avers that the district court improperly discounted comparator, statistical, and other circumstantial evidence that she offered to show pretext.  She also argues that she satisfied the elements necessary for a claim for hostile work environment.  In particular, she faults the district court for declining to find that her claims of harassment were severe or pervasive.  We address these arguments in turn.

### A.  Discrimination Claims

The ELCRA bars employers from discriminating against individuals "with respect to employment . . . or a term, condition, or privilege of employment" based on race, color, or sex. Mich. Comp. Laws § 37.2202(1)(a).  In addition to Michigan case law, we look to federal precedent interpreting Title VII of the Civil Rights Act when applying ELCRA.  *See, e.g.*, *Wasek v. Arrow Energy Servs., Inc.*, 682 F.3d 463, 468 (6th Cir. 2012); *Rouch World, LLC v. Dep't of C.R.*, 987 N.W.2d 501, 507 (Mich. 2022).

When, as here, a plaintiff only presents circumstantial evidence to support her workplace-discrimination claim, we apply the three-part framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Lowe v. Walbro, LLC*, 147 F.4th 601, 611 (6th Cir. 2025); *Hazle v. Ford Motor Co.*, 628 N.W.2d 515, 523 (Mich. 2001). At step one, a plaintiff must "present a rebuttable prima facie case . . . from which a factfinder could *infer* that the plaintiff was the victim of unlawful discrimination." *Lowe*, 147 F.4th at 611 (quoting *DeBrow v. Century 21 Great Lakes, Inc.*, 620 N.W.2d 836, 837 (Mich. 2001)). If she establishes a prima facie case, then at step two, the burden shifts to the defendant to present a legitimate, non-discriminatory reason for the adverse action. *Id.* (citation omitted). At step three, the plaintiff must show that the employer's reason is mere pretext to disguise unlawful discrimination. *Id.* (citation omitted).

A prima facie discrimination case has four elements. A plaintiff must show that (1) she belongs to a protected class, (2) she suffered an adverse employment action, (3) she was qualified for the job, and (4) the adverse action "occurred under circumstances giving rise to an inference of discrimination." *Id.* (citation omitted). All agree that Spicer fulfills the first two elements. So only the third and fourth elements are at issue here.

With respect to the third element, Spicer argues that the district court erroneously relied upon the performance and behavioral inadequacies that Harvard used to justify her termination as the gauge for whether she was qualified for the position. An employee can show that she is "qualified" by pointing to "credible evidence that . . . her qualifications are at least equivalent to the minimum objective criteria required for employment in the relevant field." *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 575–76 (6th Cir. 2003) (en banc). Relevant objective indicia include "the plaintiff's education, experience in the relevant industry, and demonstrated possession of the required general skills." *Id.* at 576. To avoid conflating "the distinct stages of the

*McDonnell Douglas* test," however, district courts must evaluate this factor "independent of the employer's proffered nondiscriminatory reasons for discharge." *Cicero v. Borg-Warner Auto., Inc.*, 280 F.3d 579, 585 (6th Cir. 2002); *see also Williams v. Dep't of Health & Hum. Servs.*, No. 355203, 2021 WL 5027962, at *4 (Mich. Ct. App. Oct. 28, 2021). So courts should not consider an employer's proffered reason for terminating the plaintiff until the "later stages" of the analysis. *Cicero*, 280 F.3d at 585; *see also Williams*, 2021 WL 5027962, at *4.

Here, the district court found that Spicer was not qualified because, against Harvard's evidence that she performed poorly, she "ha[d] not shown that she did her job well enough to survive summary judgment." *Spicer*, 2024 WL 2963766, at *2. In doing so, the district court pointed to Harvard's evidence of Spicer's performance problems and her major rules violations. *Id.* at *2–3. But this kind of analysis conflates the qualification prong with the employer's non-discriminatory reasons justifying a plaintiff's termination. Because "[w]e have repeatedly cautioned district courts against considering the employer's alleged nondiscriminatory reason when analyzing the prima facie case," *Loyd v. Saint Joseph Mercy Oakland*, 766 F.3d 580, 590 (6th Cir. 2014) (citation modified), the facts the district court relied on could not be used to show a lack of qualifications.

So we turn then to the evidence that Spicer offered to establish that she was performing "at a level that met [her] employer's legitimate expectations." *Cicero*, 280 F.3d at 585 (quoting *Town v. Mich. Bell Tel. Co.*, 568 N.W.2d 64, 69 (Mich. 1997). In *Wexler*, we determined that answering the qualification question is not a subjective exercise. 317 F.3d at 575. It requires courts to "focus on a plaintiff's *objective* qualifications" to decide whether she is qualified for the particular job. *Id.* As Harvard points out, in the district court, Spicer cited no evidence about her qualifications. So she necessarily failed her burden. On appeal, she points to several facts, including that Harvard

allegedly "entrusted her with a high-profile suite," "allowed her to work without discipline for a significant period," and "did not contend she lacked basic skills or credentials." (Appellant's Br., ECF 17, 22). Notably, Spicer pointed to none of these alleged facts to support her argument in the district court, raising the prospect that she has forfeited these arguments on appeal. *See Grand v. City of Univ. Heights*, 159 F.4th 507, 515 (6th Cir. 2025) ("Parties forfeit arguments at the summary judgment stage by failing to adequately address them in response to a motion for summary judgment." (citation omitted)). Besides, while some caselaw suggests that intermittent negative performance reviews do not undercut an experienced employee's objective qualifications for a position, *see, e.g.*, *Loyd*, 766 F.3d at 584, 590, we need not determine whether Spicer met that criteria here, because her prima facie case cannot survive on other grounds.

Spicer's claims ultimately fail on the fourth prong. To support an inference of discrimination, Spicer must "present evidence that the employer's actions, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." *Hazle*, 628 N.W.2d at 525 (citation modified). As a threshold matter, we note that Spicer conceded much ground—on both discrimination claims—during her deposition. Regarding sex discrimination, she testified that she did not think that any women, including herself, were terminated based on sex. True, she believed that Copeland treated men better than women because he was more cordial with men, but she could not recall specific incidents. She also believed that Copeland was harsher on women, but only because another employee told her as much. Regarding race, Spicer admitted that she could not identify a non-Black employee who was treated differently than Black employees. Spicer suggested that Graham-Coltrane's comment about not wanting Spicer "to sit in [her] chair either" was racially charged because her tone was unpleasant. (Spicer Dep., R. 59-6, PageID 1773–74). But by Spicer's own admission, she assumed that the comment was

motivated by race even though no facts backed up that assumption. Spicer did not give any other examples of offensive, race-based communications or conduct.

Still, Spicer presents two kinds of evidence: comparator evidence supporting her sex discrimination claim and statistical evidence supporting her race discrimination claim. Comparator evidence may show that she was "treated differently from similarly situated individuals outside the protected class." *Lowe*, 147 F.4th at 611. A proper comparator resembles a plaintiff "in all relevant respects *and* has engaged in acts of comparable seriousness." *Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 304 (6th Cir. 2016). We independently determine the relevant contours of similarity "based on the facts of the case." *Id*. We may consider "whether the individuals have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 710 (6th Cir. 2006) (citation modified). And as to statistical evidence, it may be probative if it "show[s] a significant disparity and eliminate[s] the most common nondiscriminatory explanations for the disparity." *Peeples v. City of Detroit*, 891 F.3d 622, 635 (6th Cir. 2018) (citation modified).

Spicer's evidence does not raise a genuine issue of material fact. Spicer names one proposed comparator: a fellow cleaner named Robert Hood. As a man, Hood is outside Spicer's protected class. Spicer points out that Hood got an LCA before he was terminated for poor performance. Hood's LCA stemmed from three written reprimands he received that were based on multiple tenants' complaints about the quality of his work. When more complaints accrued, Harvard terminated his employment. He and Spicer are similar in some respects: They both reported to Copeland, and both had a history of performance-based complaints. But these

similarities are not enough to render them "similarly situated . . . in all *relevant* respects." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352–53 (6th Cir. 1998). For one, deficient performance is a minor violation of company policy that, if repeated, may lead to termination. Hood's repeated minor violations were not "acts of comparable seriousness" to Spicer's major violations of company policy that precipitated her termination. *Tennial*, 840 F.3d at 304. That distinguishes his conduct and accounts for Harvard's treatment of him. *See Wright*, 455 F.3d at 710.

Next, Spicer points to statistical evidence showing that approximately 94% of the employees that Harvard terminated over a five-year period are Black. At the same time, Harvard's workforce is approximately 93% Black.[2] "Appropriate statistical data showing an employer's pattern of conduct toward a protected class as a group can, if unrebutted, create an inference that a defendant discriminated against individual members of the class." *Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1466 (6th Cir. 1990). But to be meaningful to our analysis, such statistics must show "a significant disparity *and* eliminate the most common nondiscriminatory explanations for the disparity." *Peeples*, 891 F.3d at 635 (citation modified). And "in a discrimination case, both the methodology and the explanatory power of the statistical analysis must be sufficient to permit an inference of discrimination." *Amini v. Oberlin Coll.*, 440 F.3d 350, 359 (6th Cir. 2006) (citation modified); *see also Thompson v. Fresh Prods., LLC*, 985 F.3d 509, 526–27 (6th Cir. 2021). Viewed through that lens, Spicer's statistical evidence does not raise an inference of racial discrimination. The percentage of Black employees in the general employee population and the percentage of employees terminated who are Black are almost the same. Indeed, from a statistical

---

[2] Our calculations yielded a 96% termination rate of Black employees amongst a 95% Black workforce. That minor discrepancy changes neither our analysis nor our conclusion. The difference between those figures is merely 1%, which is the same difference reflected in the parties' figures.

perspective, no more than 7% of terminations could ever involve employees outside the protected group. So the most common nondiscriminatory explanation for the high percentage of terminations of Black employees is that the overwhelming majority of Harvard's employees at this location are Black. Consequently, Spicer has not eliminated "the most common nondiscriminatory explanation[]" for the termination figure, nor has she shown a significant disparity suggesting that Harvard made the termination decision motivated by racial animus. *Peeples*, 891 F.3d at 635 (citation modified).

Spicer also argues that these same proofs—Hood's receiving an LCA before termination and statistical evidence on terminations—demonstrate that Harvard's proffered reasons for discharging her were pretextual. But given the failure of Spicer's prima facie case, we do not advance to the pretext stage. *See Martinez v. Cracker Barrel Old Country Store, Inc.*, 703 F.3d 911, 917 (6th Cir. 2013). In any event, these proofs would be insufficient to show pretext for the same reason that they cannot establish Spicer's prima facie case. Finally, Spicer challenges two observations in the district court's dismissal order. According to Spicer, the court misread her complaint by focusing solely on Copeland's actions rather than considering the actions of all of Harvard's agents, including Graham-Coltrane. Spicer also claims that the court assumed that same-race decisionmakers are less likely to discriminate. Based on the record before us, we maintain serious reservations about the merits of both arguments. Nonetheless, our own conclusion on fresh review that Spicer has failed to establish a prima facie case of discrimination obviates the need to further consider these claims.

### B. Hostile Work Environment

Next, Spicer argues that the district court overlooked and disregarded evidence supporting her hostile-work-environment claim. We disagree and affirm the grant of summary judgment.

To establish a prima facie hostile-work-environment claim, Spicer must show five elements: (1) she is a member of a protected group, (2) she was subject to unwelcome harassment, (3) the harassment was based on membership in a protected class, (4) the harassment was "sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment," and (5) Harvard "knew or should have known about the harassment and failed to act." *Nathan v. Great Lakes Water Auth.*, 992 F.3d 557, 565 (6th Cir. 2021) (citations omitted). Spicer exclusively challenges the severe-or-pervasive factor. To prevail on that factor, she must identify conduct that is "severe *or* pervasive" enough "to alter the conditions of the victim's employment and create an abusive working environment." *Bruce v. Adams & Reese, LLP*, 168 F.4th 367, 377 (6th Cir. 2026) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).

Spicer shows neither. Little of the evidence she names is relevant for our analysis. We cannot, for instance, consider Graham-Coltrane's after-the-fact descriptions of Spicer's behavior during the grievance meeting because Spicer was not "aware [of them] during the period . . . [of] her employment." *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 335 (6th Cir. 2008). While we could potentially consider Graham-Coltrane's chair remark, Spicer's conclusion that the comment was motivated by racial animus is speculative and therefore not actionable under ELCRA. *See Harris*, 510 U.S. at 21. Moreover, a one-time comment generally cannot create a work environment "permeated with discriminatory intimidation, ridicule, and insult." *Kellar v. Yunion, Inc.*, 157 F.4th 855, 874 (6th Cir. 2025) (quoting *McNeal v. City of Blue Ash*, 117 F.4th 887, 897 (6th Cir. 2024)). And the comment could not have created an abusive working environment for Spicer because she never returned to work in the environment that she claims Graham-Coltrane's comment made hostile. Finally, Spicer alludes to systematic patterns of

discrimination. These conclusory allegations are unsupported or directly contradicted by the record. They therefore cannot establish a genuine issue of material fact. *See Viet*, 951 F.3d at 823. As a result, Harvard is entitled to summary judgment on Spicer's hostile-work-environment claim.

**IV.**

Spicer also asks us to reverse the district court's denial of her reconsideration motion. That motion raised the exact issues we address in this appeal, and the district court thoroughly considered each. While the court employed the outdated Local Rule standard requiring a "palpable defect" to call for a change in disposition, *see* E.D. Mich. L.R. 7.1(h), we agree with the bottom line. The district court found, as we do, that Spicer did not identify evidence to establish a prima facie case for any of her claims. So the court was correct to conclude that reconsideration was unwarranted.

**V.**

For the reasons discussed above, we **AFFIRM**.