*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2004 FED App. 0003P (6th Cir.)
File Name: 04a0003p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

JAMES MATTIS,
       *Plaintiff-Appellee,*

*v.*

DAVID MASSMAN and
GENERAL MOTORS
CORPORATION,
       *Defendants-Appellants.*

No. 02-1301

Appeal from the United States District Court
for the Eastern District of Michigan at Ann Arbor.
No. 01-60177—Marianne O. Battani, District Judge.

Argued: May 21, 2003

Decided and Filed: January 6, 2004

Before: BOGGS, Chief Judge; and NELSON and COLE,
Circuit Judges.

_____

**COUNSEL**

**ARGUED:** Timothy K. McConaghy, HARDY, LEWIS &
PAGE, Birmingham, Michigan, for Appellants. George F.
Killeen, II, Flint, Michigan, for Appellee. **ON BRIEF:** Alex

L. Alexopoulos, HARDY, LEWIS & PAGE, Birmingham,
Michigan, for Appellants. George F. Killeen, II, Flint,
Michigan, for Appellee.

_____

**OPINION**

_____

BOGGS, Chief Judge. Defendants David Massman and
General Motors Corporation ("GM") appeal from the district
court's order granting Plaintiff James Mattis's motion to
remand and amend his complaint. Mattis had initially raised
four separate state-law claims in his complaint filed in the
Michigan state court. GM subsequently removed the case to
federal court on the grounds that all Mattis's claims were
preempted by § 301 of the Labor Management Relations Act,
29 U.S.C. § 185. In the district court, Mattis moved to amend
his complaint and eliminate two of his four claims. He
argued that the remaining two tort claims were not preempted
because they did not implicate the collective bargaining
agreement governing Mattis's employment. The district court
agreed and granted the motion to remand. Because we find
that Mattis's remaining claims were preempted by § 301, we
now reverse.

I

GM employed James Mattis as an hourly production
worker in a metal fabricating plant in Flint, Michigan.
Because Mattis was a member of a bargaining unit
represented by the United Automobile, Aerospace, and
Agricultural Implement Workers ("UAW"), his employment
was governed by the collective bargaining agreement
("CBA") entered into by UAW and GM. He worked at the
plant up through October 11, 2000, when he was terminated
after allegedly striking his supervisor, David Massman.
Mattis disputed this allegation and subsequently filed a

complaint against both Massman and GM in the Michigan state court.

In his complaint, Mattis raised four separate state-law claims against GM: (1) "Interference with an Existing Contract"; (2) "Tortious Interference with an Advantageous Economic Relationship or Expectation"; (3) "Tortious Interference with Contractual Relationship"; and (4) "Intentional Infliction of Emotional Distress." To support each claim, Mattis alleged that he had been wrongfully terminated and that he had been subjected to repeated harassment by Massman long before his termination. According to Mattis, Massman's harassment included assigning workers with less seniority to the more desirable jobs, preventing Mattis from learning how to perform certain tasks, following Mattis around and recording when he was late, forcing Mattis to perform the more difficult jobs in the plant, causing Mattis to lose vacation days, and refusing to grant Mattis an excused absence when he was ill. On the day Mattis allegedly struck Massman, Mattis claimed that Massman had insulted his daughters.

On August 21, 2001, GM removed the case to federal court on the ground that Mattis's claims were preempted by § 301 of the Labor Management Relations Act ("LMRA"). Mattis responded, on September 19, by filing a motion to amend his complaint and remand the case back to state court. Mattis wanted to amend his complaint by eliminating Counts I and III (listed above). According to Mattis, because Counts II and IV (i.e., the remaining claims) were not preempted by § 301, the case should be remanded back to the Michigan state court. GM disputed this claim, arguing that Counts II and IV were still preempted by § 301. Although Counts II and IV were tort claims, GM argued that they were essentially claims for breach of contract, which were clearly preempted by § 301.

After a hearing on the issue of preemption, the district court found that Counts II and IV were not preempted by § 301 and granted Mattis's motion to remand and amend his complaint.

In reaching its decision, the district court reasoned that the tort claims were not preempted because they were premised on the alleged harassment, rather than the wrongful termination. The district court granted the motion on December 17, 2001, and GM filed a Motion for Reconsideration on January 2, 2002. The district court denied this motion on February 12, 2002. GM now timely appeals both the granting of Mattis's motion to remand and amend his complaint, along with the denial of GM's motion to reconsider.

II

We must decide whether the district court erred in finding that Counts II ("Tortious Interference with an Advantageous Economic Relationship or Expectation") and IV ("Intentional Infliction of Emotional Distress") were not preempted by § 301. We review the district court's decision regarding subject matter jurisdiction *de novo*. *Long v. Bando Mfg. of Am.*, 201 F.3d 754, 759 (6th Cir. 2000).

Section 301 provides that:

Suits for violations of contracts between an employer and a labor organization representing employees in an industry affecting commerce . . . may be brought in any district court of the United States having jurisdiction of the parties. . . .

29 U.S.C. § 185(a). As this court has explained, "[t]he Supreme Court has interpreted this language to require federal pre-emption of state law-based actions . . . [when those actions are] inextricably intertwined with consideration of the terms of the labor contract." *Jones v. Gen. Motors Corp.*, 939 F.2d 380, 382 (6th Cir. 1991) (citing *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 213 (1988) and *Textile Workers Union v. Lincoln Mills*, 353 U.S. 448 (1957)) (internal quotations and citations omitted). The Supreme Court has justified its

interpretation by emphasizing the importance of uniform federal law in this area.

> [T]he subject matter of Section 301(a) is peculiarly one that calls for uniform law. . . . The possibility that individual contract terms might have different meanings under state and federal law would inevitably exert a disruptive influence upon both the negotiation and administration of collective agreements. . . . The importance of the area which would be affected by separate systems of substantive law makes the need for a single body of federal law particularly compelling. The ordering and adjusting of competing interests through a process of free and voluntary collective bargaining is the keystone of the federal scheme to promote industrial peace. State law which frustrates the effort of Congress to stimulate the smooth functioning of that process thus strikes at the very core of federal labor policy.

*Local 174, Teamsters v. Lucas Flower Co.*, 369 U.S. 95, 103-04 (1962).

Given the importance of maintaining uniform federal law, the Supreme Court "has made clear that § 301 of the LMRA preempts any state-law claim arising from a breach of a collective bargaining agreement." *Smolarek v. Chrysler Corp.*, 879 F.2d 1326, 1329 (6th Cir. 1989) (en banc). Preemption under § 301 applies not only to state-law contract claims, but has been expanded to include state-law tort claims as well. *Id*. at 1329-30 (citing *Allis-Chalmers Corp.*, 471 U.S. at 217). Not every tort claim, however, relating to employment will be subject to preemption under § 301. *Id*. at 1330. To survive preemption under § 301, the tort claims must be "independent" of the CBA. *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 409-10 (1989); *Allis-Chalmers Corp.*, 471 U.S. at 213 (analyzing state-law claim to determine if it was "independent of any right established by contract, or, instead, whether evaluation of the tort claim [was] inextricably intertwined with consideration of the terms

of the labor contract"); *DeCoe v. Gen. Motors Corp.*, 32 F.3d 212, 216 (6th Cir. 1994) (citing *Lingle*).

In *Allis-Chalmers Corp.*, for example, the plaintiff brought a Wisconsin tort claim of bad-faith handling of an insurance claim against the defendant. The plaintiff's right to insurance, however, had been established by the collective bargaining agreement entered into by his union and the defendant. In finding the claim to be preempted, the Supreme Court explained, "[b]ecause the right asserted not only derives from the contract, but is defined by the contractual obligation of good faith, any attempt to assess liability here inevitably will involve contract interpretation." 471 U.S. at 218. Yet, in *Lingle*, the Supreme Court found that the plaintiff's retaliatory discharge claim, which alleged retaliation for filing a workers' compensation claim, was not preempted by § 301. The Supreme Court reasoned, "the state-law remedy in this case is 'independent' of the collective-bargaining agreement in the sense of 'independent' that matters for § 301 pre-emption purposes: resolution of the state-law claim does not require construing the collective bargaining agreement." 486 U.S. at 407. Thus, the basic question before this court is whether Mattis's state-law tort claims are "independent" of the CBA that governed his employment.

To determine whether a state-law claim is sufficiently "independent" to survive § 301 preemption, this court has adopted a two-step inquiry. *DeCoe*, 32 F.3d at 216-17. First, courts must determine whether resolving the state-law claim would require interpretation of the terms of the collective bargaining agreement. If so, the claim is preempted. Second, courts must ascertain whether the rights claimed by the plaintiff were created by the collective bargaining agreement, or instead by state law. *Id*. at 216. If the rights were created by the collective bargaining agreement, the claim is preempted. In short, if a state-law claim fails *either* of these two requirements, it is preempted by § 301. Using the approach established in *DeCoe*, we now evaluate each of Mattis's two state-law claims.

### A

In Count II, Mattis raised a claim of "Tortious Interference with an Advantageous Economic Relationship or Expectation." In *DeCoe*, this court construed this particular claim as constituting a claim of tortious interference with a business relationship under Michigan law. 32 F.3d at 218. To prevail, a plaintiff must establish:

(1) the existence of a valid business relation (not necessarily evidenced by an enforceable contract) or expectancy; (2) knowledge of the relationship or expectancy on the part of the defendant interferer; (3) an intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resulting damage to the party whose relationship or expectancy has been disrupted.

*Wausau Underwriters Ins. Co. v. Vulcan Dev., Inc.*, 323 F.3d 396, 404 (6th Cir. 2002) (citing *Mich. Podiatric Med. Ass'n v. Nat'l Foot Care Program, Inc.*, 438 N.W.2d 349, 354 (Mich. Ct. App. 1989).

The question of whether the elements of this state-law claim should be considered independent of the CBA was clearly answered by this court in *DeCoe*, in which we held that § 301 preempted plaintiff's claim of tortious interference with economic relations (construed as tortious interference with a business relationship). In *DeCoe*, the plaintiff brought a complaint against several of his co-workers for whom he had served as a committeeman, or supervisor. 32 F.3d at 214-15. The workers had previously filed administrative proceedings against the plaintiff for alleged sexual harassment, and the plaintiff subsequently sued them for defamation, tortious interference, and intentional infliction of emotional distress. In finding the tortious interference claim preempted, we assumed that the plaintiff satisfied the first requirement because no interpretation of the contractual terms was necessary. We still found the claim preempted, however,

because it asserted a right created not by state law, but by the collective bargaining agreement (thus violating the second requirement). "[R]esolution of the plaintiff's claim will not involve the direct interpretation of [the] CBA, but . . . will require a court to address relationships that have been created through the collective bargaining process and to mediate a dispute founded upon rights created by a CBA." *Id.* at 218 (quoting *Jones v. Gen. Motors Corp.*, 939 F.2d 380, 382-83 (6th Cir. 1991)). In these two previous cases (*DeCoe* and *Jones*), the plaintiffs' claims sought to vindicate rights created by the collective bargaining agreements. In *DeCoe*, the plaintiff alleged that the defendant "interfered with Plaintiff's job as a Local 326 committeeman." 32 F.3d at 218. The rights and responsibilities of the committeeman, however, were created and defined by the CBA. *Ibid.* In *Jones*, the plaintiff alleged that the defendant breached the terms of a settlement agreement, which he claimed required him to be reinstated. As we noted, however, "the settlement agreement itself [was] a creature wholly begotten by the CBA." 939 F.2d at 383. Thus, the claim was the "archetype of a state-law claim that by its very nature involve[d] an examination of the employment relationship of parties to a CBA." *Ibid.*

*DeCoe* requires that Mattis's claim be preempted. Similarly to the plaintiff in *DeCoe*, Mattis alleged interference with a business relationship that was "created entirely by the CBA." *DeCoe*, 32 F.3d at 218. Both Mattis and the district court attempted to distinguish *DeCoe* by emphasizing that "committeemen" were the unique creations of the collective bargaining agreement in question, which made preemption more compelling. The relationship in this case, however, was also created by the CBA. Even more importantly, the question of whether Massman "interfered" with Mattis's business relationship would require us to delve into the rights and responsibilities of plant supervisors under the CBA. Undoubtedly, the supervisor would claim that his actions were consistent with his duties as a supervisor at the factory. Congress intended such questions to be addressed within the realm of federal, not state, law.

Finally, we note that Mattis has not established the existence of any external regime of state law that would allow him to allege violations of rights independent from the rights created by the CBA. For example, in *Smolarek v. Chrysler Corp.*, the plaintiff's tort claim survived preemption in part because it asserted rights established by Michigan's law against handicap discrimination. 879 F.2d 1326, 1331 (6th Cir. 1989) (en banc). Similarly, in *O'Shea v. Detroit News*, the plaintiff's claim survived preemption in part because it asserted claims of retaliatory discharge and age discrimination. 887 F.2d 683, 686-87 (6th Cir. 1989) (en banc). Mattis's complaint, by contrast, alleged violations of rights established only by the CBA. For instance, he alleged that Massman denied him vacation days, failed to provide proper training, and failed to excuse his absences for illness. These entitlements belonged to Mattis solely because of the CBA. Count II is preempted.

### B

In Count IV, Mattis raised a claim of "Intentional Infliction of Emotional Distress." Although the Michigan Supreme Court has yet to recognize this cause of action, "the Michigan Court of Appeals has recognized such a tort, and we have assumed that the Michigan Supreme Court would do so too under appropriate circumstances." *Andrews v. Prudential Secs., Inc.*, 160 F.3d 304, 309 (6th Cir. 1998). To prevail on a claim of intentional infliction of emotional distress, the plaintiff must establish: (1) extreme and outrageous conduct; (2) intent or recklessness; (3) causation; (4) and severe emotional distress. *Ibid.*

Mattis originally claimed that both his termination and Massman's harassment prior to termination constituted "outrageous" conduct under Michigan law. The district court, however, concluded that Mattis's claim was not preempted because it was premised only on the harassment and not the termination. The district court explained, "if plaintiff's count four is premised on his termination by General Motors, then

of course the [c]ourt would have to look to that CBA to decide whether or not that termination was outrageous." As GM points out, however, Mattis's counsel had just been asked (at the hearing) whether Count IV was premised on the termination or the harassment. Counsel responded, "The harassment, and the termination. . . . It was a combination of the two. My answer would have to be both." While this response alone calls the district court's decision into question, we hold Count IV to be preempted even if it is premised *only* on the alleged harassment.

Once again, *DeCoe* governs the outcome. In *DeCoe*, we concluded that this exact claim was preempted because it would require us to interpret the collective bargaining agreement in order to determine whether the alleged conduct was "outrageous." We explained, "a defendant has not acted outrageously where he has done no more than to insist upon his legal rights in a permissible way." 32 F.3d at 219 (quoting *Polk v. Yellow Freight Sys., Inc.*, 801 F.2d 190, 196 (6th Cir. 1986) (internal quotations omitted)).

As in *DeCoe*, determining whether Massman's alleged harassment constituted "outrageous conduct" would force us to look to the CBA. Without reference to the CBA, we could not possibly know whether Massman acted outrageously or was merely insisting on his legal rights as a supervisor charged with ensuring compliance with the rules of the factory. Even if we give Mattis the benefit of the doubt about whether we would have to interpret the terms of the CBA, his claim clearly fails to meet the second requirement announced in *DeCoe*. This is not to say that § 301 has preempted all claims of intentional infliction of emotional distress that may be brought by an employee. *See O'Shea v. Detroit News*, 887 F.2d 683, 687 (6th Cir. 1989) (en banc) (finding that § 301 did not preempt intentional infliction of emotional distress claim where allegations were "independent of any alleged violation of the contract"). Mattis's allegations, however, all involve workplace actions taken under the ostensible authority of the CBA, and seem to be a subtle attempt to

present contract claims in tort clothing. *See DeCoe*, 32 F.3d at 216 (requiring courts to look "to the essence of the plaintiff's claim, in order to determine whether the plaintiff is attempting to disguise what is essentially a contract claim as a tort"). For example, Mattis alleged that Massman ignored his seniority rights in assigning jobs, failed to train him properly, assigned him the most strenuous jobs, prevented him from receiving his pay on time, reduced his vacation days, and punished Mattis for using the company phone. To allow such allegations to proceed in state court would eviscerate the uniform federal regime established by Congress via § 301.

### III

Because we find Mattis's two remaining state-law claims to be preempted, we REVERSE the district court's order to the extent it remanded the case to state court. Our decision makes it unnecessary to review GM's motion to reconsider. The case will be REMANDED to the district court, which may consider any motions to amend the complaint in light of our decision.