WAVERLY D. CRENSHAW, JR., CHIEF UNITED STATES DISTRICT JUDGE
*1050 After Titus Gulley (Gulley") was fired from his job at General Motors ("GM") because he had a handgun in his vehicle, he filed suit in the Chancery Court for Montgomery County, Tennessee, claiming that GM's no firearms policy violates Tennessee law. GM removed the case to this Court and, thereafter, filed a Motion to Dismiss (Doc. No. 8) on the grounds that Gulley's conduct was governed by a Collective Bargaining Agreement ("CBA") and the subject of a Grievance Settlement entered into between GM and his Union.
The Motion to Dismiss has been fully briefed by the parties. (Doc. Nos. 9, 10, 13 & 16). For the reasons that follow, the Motion will be denied.
I. Factual Background
Because this matter is before the Court on a Motion to Dismiss under Rule 12(b)(6), the facts alleged in the Complaint are considered true and construed in Gulley's favor. Philadelphia Indem. Ins. Co. v. Youth Alive, Inc., 732 F.3d 645, 649 (6th Cir. 2013). Further, "documents integral to the complaint may be relied upon, even if they are not attached or incorporated by reference," to the extent "that there exist no material disputed issues of fact regarding the relevance of the document." Ouwinga v. Benistar 419 Plan Servs., Inc., 694 F.3d 783, 797 (6th Cir. 2012) (citation omitted). The factual allegations and relevant documents show the following.
On July 20, 2016, Gulley began working for GM at its manufacturing facility in Spring Hill, Tennessee. During his employment, Gulley was a member of the United Auto Workers Local 1853, and covered by a CBA between GM and that Union.
On July 12, 2017, Gulley drove to work and parked in the employee parking lot. At the time he had a handgun in his vehicle, secreted in a small compartment below the steering wheel.
After walking into the plant, Gulley was asked to accompany his group leader to her desk. At the desk was a Union Committeeman and a GM Manager. Gulley was told that he needed to gather his belongings and meet with GM management in another part of the facility. After collecting his belongings, Gulley was escorted to a meeting room where he was met by a GM Labor Representative, the facility's Chief of Security, and a Maury County Deputy Sheriff.
Upon being informed that an anonymous tipster had placed a phone call to the "GM Awareline" stating that Gulley had a weapon at the facility, Gulley consented to a search of his person, locker, and vehicle. A handgun was found in Gulley's vehicle after he told the Deputy Sheriff where it was located.
Once the handgun was retrieved and photographed, Gulley returned to the meeting room and was asked by the Labor Representative why he had a gun. Gulley stated that he had the handgun in his vehicle for protection. The Labor Representative then told Gulley that she was "writing him up," and stepped out of the room. The Union Committeeman also stepped out of the room. After a couple of minutes, both returned and Gulley was handed a "Notice of Disciplinary Action or Discharge" form. The form indicated that Gulley was being discharged because he violated "Standard of Conduct # 14." (Doc. No. 1-2 at 14).
Standard of Condition # 14 is a provision in the local CBA that reads:
STANDARDS OF CONDUCT
*1051 Serious misconduct may include any of the following actions or behaviors by a team member will be sufficient grounds for corrective action ranging from reprimand to immediate discharge. In as much as all misconduct cannot be anticipated, this list is not intended to be exhaustive.
* * *
14. Possession of weapons or explosive material on Company premises at any time.
(Doc. No. 9-1 at 16).
After being discharged, Gulley received a copy of GM's Global Security Policy ("Security Policy"), which states that "GM will not tolerate the possession of guns, dangerous devices, or other weapons while on company property, including company parking lots." The Security Policy further states that, "[u]nless this policy violates local law, it remains a violation of the policy to have weapons of any kind on GM property, event when they are kept in employees' personal vehicles." (Doc. No. 1-2 ¶ 20).
On July 16, 2017, Michael Herron, the Union Chairman, emailed Ron Rich, GM's Plan Personnel Manager, and explained that, in the Union's view, GM's policy was in conflict with Tenn. Code Ann. § 50-1-312(b). Herron also stated that it was the Union's position that the statute protected Gulley's right to keep the handgun locked in his vehicle and demanded that Gulley be returned to work immediately. (Id. ¶ 22).
On August 9, 2017, Gulley, the Union, and GM entered into a "Grievance Settlement" that reads:
Without prejudice to the position of either party and on a non-precedent setting basis, the grievance is withdrawn by the Union. The grievant will be reinstated to his previously held position and paid for lost time.
The grievant's return to active status (report for work) will be contingent upon the outcome of a "fit for work" evaluation to be performed by GM Medical. The purpose of the exam is to determine the grievant's mental and physical ability to return to work and to ensure that the grievant does not represent a threat to himself or others. In the event of an unsatisfactory assessment, the grievant shall be reinstated as noted above and placed on a sick leave of absence until such time as he is found able to return to work."
(Doc. No. 9-3 at 1).
Gulley submitted to the request for a medical evaluation via a telephone conference on August 11, 2017 with a "Doctor Jones" hired by GM. Both Herron and a "Doctor Bruce" were present, and "both of GM's own medical professionals, Dr. Jones and Dr. Bruce, stated that Gulley was 'fit to work.' " (Doc. No. 1-2 ¶ 23). Nevertheless, GM did not return Gulley to work. Instead, GM representatives called Gulley and informed him that he needed to undergo a second evaluation on August 24, 2017. Gulley said he was not available that day.
On August 25, 2017, Gulley (or his counsel) was told by Holly Georgell, GM's in-house counsel, that Gulley would be reinstated with full pay, but would be placed on leave rather than returned to work. Five days later, he received a copy of his pay stub that indicated he was being paid $3,847.50 in back wages, which was approximately $1,000 less than he was owed.
On September 2, 2017, Gulley was told by Georgell that GM did not intend to reinstate him unless and until he successfully completed the second fit-for-duty evaluation. Gulley also received a printout indicating the $3,837.50 was for "T. Gulley Discharge Settlement." Less than three weeks later Gulley filed suit.
*1052 The Complaint is in two counts. Count One seeks injunctive relief pursuant to Tenn. Code Ann. § 50-1-312(B)(1)(B)"to prohibit GM from: (a) taking any further adverse employment actions, of any kind, against Gulley as a result of the July 12, 2017 incident or any subsequent possession of his handgun inside his locked vehicle; and (b) requiring Gulley to submit to any further medical or psychological evaluations predicated upon the July 2017 [incident] or his current or future possession of a handgun inside his locked vehicle; and (c) enforcing any GM policy at the Spring Hill facility against Gulley or any other GM employee that violates Tennessee Code Annotated § 50-10312(b)(1)(A)." (Id. ¶ 39). Count Two seeks "economic damages, including back pay, front pay, the economic value of employee benefits, and consequential economic damages pursuant to Tennessee Code Annotated § 50-1-312(b)(1)(B)." (Id. ¶ 42).
II. Standard of Review
Even though the Court is required to construe the well-pleaded facts from the Complaint in favor of Gulley in ruling on GM's Motion to Dismiss, those "[f]actual allegations must be enough to raise a right to relief above the speculative level," and "state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id."Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.' " Id. (quoting Twombly, at 557, 127 S.Ct. 1955 )
III. Legal Discussion
GM's Motion to Dismissed is based on three grounds. First, it argues that Gulley's claims are preempted by Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185, he has not exhausted his contractual remedies, and he has not alleged the Union breached its duty of fair representation. Second, GM argues that the present dispute is barred by the Grievance Settlement. Third, GM argues that the "adverse employment actions" about which Gulley complains were the result of the Grievance Settlement he knowingly and willfully signed.
A. Section 301
Section 301 provides that "[s]uits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce ... may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties." 29 U.S.C. § 185(a). Thus, even though federal question jurisdiction is generally determined from the face of a complaint, a claim purportedly based solely on state law may provide jurisdiction because Section 301 of the LMRA had preempted that particular state law. Klepsky v. United Parcel Serv., Inc., 489 F.3d 264, 269 (6th Cir. 2007) ; Smolarek v. Chrysler Corp., 879 F.2d 1326, 1329 (6th Cir. 1989) (en banc).
Section 301 "governs claims founded directly on rights created by collective-bargaining agreements, and also claims 'substantially dependent on analysis of a collective-bargaining agreement.' " Caterpillar Inc. v. Williams, 482 U.S. 386, 394, 107 S.Ct. 2425, 96 L.Ed.2d 318 (1987).
*1053 That is, the preemptive effect of "§ 301 reaches beyond the violation of contracts" and " 'preempts state law rules that substantially implicate the meaning of collective bargaining agreement terms.' " Powers v. Cottrell, Inc., 728 F.3d 509, 516 (6th Cir. 2013) (quoting DeCoe v. Gen. Motors Corp., 32 F.3d 212, 216 (6th Cir.1994) ).
"[W]hen the meaning of contract terms is not the subject of dispute, the bare fact that a collective-bargaining agreement will be consulted in the course of state-law litigation plainly does not require the claim to be extinguished.' " Id. (quoting Livadas v. Bradshaw, 512 U.S. 107, 124, 114 S.Ct. 2068, 129 L.Ed.2d 93 (1994) ). Thus, "[e]ven if dispute resolution pursuant to a collective-bargaining agreement, on the one hand, and state law, on the other, would require addressing precisely the same set of facts, as long as the state law claim can be resolved without interpreting the agreement itself, the claim is 'independent' of the agreement for § 301 pre-emption purposes." Lingle v. Norge Division of Magic Chef, Inc., 486 U.S. 399, 409-10, 108 S.Ct. 1877, 100 L.Ed.2d 410 (1988).
To aid courts in determining whether a state law claim has been preempted, the Sixth Circuit has developed a two-step inquiry. "The first step requires [a court] to determine 'whether resolving the state-law claim would require interpretation of the terms' of the CBA." Loyd v. Saint Joseph Mercy Oakland, 766 F.3d 580, 592 (6th Cir. 2014) (quoting Mattis v. Massman, 355 F.3d 902, 905 (6th Cir.2004) ). "If interpretation of the CBA would be required, then the state-law claim is preempted and the inquiry is at an end." Id."The second step involves ascertaining 'whether the rights claimed by the plaintiff were created by the [CBA], or instead by state law.' " Id."If the rights were created by the CBA, then the state-law claim is preempted." Id.; accord Paul v. Kaiser Found. Health Plan of Ohio, 701 F.3d 514, 519 (6th Cir. 2012) ; DeCoe v. Gen. Motors Corp., 32 F.3d 212, 216 (6th Cir.1994).
Here, the preemption inquiry fails at both steps. The right allegedly violated is provided by state law, specifically Tenn. Code Ann. § 50-1-312. In relevant part, that statute provides:
(b)(1)(A) No employer shall discharge or take any adverse employment action against an employee solely for transporting or storing a firearm or firearm ammunition in an employer parking area in a manner consistent with § 39-17-1313(a).
(B) An employee discharged, or subject to an adverse employment action, in violation of subdivision (b)(1)(A) shall have a cause of action against the employer to enjoin future acts in violation of this section and to recover economic damages plus reasonable attorney fees and costs.
* * *
(2) In any action brought pursuant to this section, the employee shall have the burden of establishing a prima facie case of discharge, or adverse employment action, based solely on the employee's transporting or storing a firearm or firearm ammunition in the employer's parking area in a manner consistent with § 39-17-1313(a).
Tenn. Code Ann. § 50-1-312(B). Section 39-17-1313(a), in turn, provides that "the holder of a valid handgun carry permit recognized in Tennessee may, unless expressly prohibited by federal law, transport and store a firearm or firearm ammunition in the permit holder's motor vehicle ... while on or utilizing any public or private parking area," if the firearm or ammunition "(A) Is kept from ordinary *1054 observation if the permit holder is in the motor vehicle; or (B) Is kept from ordinary observation and locked within the trunk, glove box, or interior of the person's motor vehicle or a container securely affixed to such motor vehicle if the permit holder is not in the motor vehicle." 39-17-1313(a)(2). A parking area "means any property provided by a ... public or private employer ... for the purpose of permitting its invitees, customers, clients or employees to park privately owned motor vehicles." Id. (c)(2)(A).
Even though Tenn. Code Ann. § 50-1-312 does not appear to have been the subject of any reported cases, it seems relatively clear from the statute's language that, to plead a violation, a plaintiff must allege that (1) he was an employee; (2) he was discharged or suffered an adverse employment action; and (3) the sole reason for the discharge was that he stored or transported a firearm or ammunition in his vehicle in accordance with Tenn. Code Ann. § 39-17-1313(a).
In this case, Gulley alleges that he was a GM employee, he parked in an employee parking lot provided by GM, he possessed a valid Tennessee Handgun Permit, and he had a handgun hidden in a compartment within his locked vehicle. Gulley also alleges that he was discharged solely because he engaged in protected activity under Tenn. Code Ann. § 39-17-1313(a). These allegations, all without any touching upon the CBA, are sufficient to state a claim for a violation of Tenn. Code Ann. § 50-1-312.
In arriving at this conclusion, the Court recognizes that Gulley may have a difficult time establishing that the sole reasons for his discharge was a violation of Tennessee state law. This is particularly so given Gulley's acknowledgment that the Discharge Notice listed only one reason for his discharge, specifically the violation of Standard of Conduct # 14. Indeed, Gulley's acknowledgment may well prove fatal because the statute contemplates a burden-shifting approach similar to the McDonnell Douglas paradigm such that GM is allowed to produce evidence of a legitimate non-discriminatory reason that Gulley would have to rebut.[1]
Nevertheless, the question now before the Court is simply one of preemption and "reliance on the CBA as a defense is, in itself, insufficient to trigger preemption." Paul, 701 F.3d at 521. This is true "even if the defense is anticipated in the plaintiff's complaint, and even if both parties concede that the federal defense is the only question truly at issue." Caterpillar, 482 U.S. at 392-93, 107 S.Ct. 2425 ; see Lingle, 486 U.S. at 407, 108 S.Ct. 1877 (holding that the factual questions underlying the tort of retaliatory discharge for filing a worker's compensation claim, including whether the employer had a nonretaliatory reason for the discharge, would not "require[ ] a court to interpret any *1055 term of a collective-bargaining agreement" and would "not turn on the meaning of any provision of a collective-bargaining agreement"); Alongi v. Ford Motor Co., 386 F.3d 716, 727 (6th Cir. 2004) ("In effect, the defendants contend that § 301 should preempt Count IV because the defendants are certain to raise a defense that requires interpretation of a collective bargaining agreement. The Supreme Court has rejected this view."); Smolarek, 879 F.2d at 1334 (holding that plaintiff's retaliatory discharge claim under Michigan law was not preempted because "the state-law tort of retaliatory discharge creates rights independent of those established by the collective bargaining agreement," and the discrimination claim was not preempted even though the employer was likely to rely on provisions of the CBA in its defense).[2]
B. Grievance Settlement
GM argues that Gulley's claims are barred by the Grievance Settlement, and that his claims relating to GM's compliance with the settlement fail as a matter of law. The Court is unpersuaded by either argument.
GM cites Smith v. Bridgestone/Firestone, Inc., 2 S.W.3d 197 (Tenn. Ct. App. 1999), Morris v. Alcan Foil Prod., 99 F.3d 1139 (6th Cir. 1996), Strozier v. Gen. Motors Corp., 635 F.2d 424 (5th Cir. 1981), and Anderson v. Frank, 755 F.Supp. 187 (E.D. Mich. 1991) for the proposition that one who voluntarily settles a claim cannot thereafter sue on the same claim because the parties had reached an accord and satisfaction. Tellingly, however, each of those cases was decided in the context of summary judgment. This is hardly surprising because accord and satisfaction is an affirmative defense for which the defendant carries the burden of showing that the parties voluntarily entered into an agreement to settle the underlying claim. Quality Care Nursing Servs., Inc. v. Coleman, 728 S.W.2d 1, 5 (Tenn. 1987) ; Pendergrass v. Ingram, 2016 WL 3625508, at *3-4 (Tenn. Ct. App. June 29, 2016). While GM argues that the "Complaint alleges that his Union argued on Plaintiff's behalf during the dispute resolution process 'that GM's policy was in conflict with Tennessee Code Annotated § 50-1-312(b),' " (Doc. No. 9 at 13), what the Complaint actually alleges is that Herron sent an email expressing that opinion to Rich. (Doc. No. 1-2 at ¶ 21). Whether that was a part of the quid pro quo for dismissal of the grievance is not clear from the language of the Grievance Settlement itself.
Furthermore, the Complaint is not limited to the issue of whether the CBA's prohibition on firearms is valid. Instead, Gulley claims that GM's "Global Security Policy" which also contains a firearms prohibition violates Tenn. Code Ann. § 50-1-312(b)(1)(A), and seeks to enjoin the enforcement of "any GM policy at the Spring Hill facility" that violates the statute. While such a request may raise a host of other issues-including whether Gulley has standing to raise claims on behalf of others who were did not suffer an adverse employment action as required by the statute, and whether such an injunction would be "the archetypical and unenforceable 'obey the law' injunction," Walker v. City of Calhoun, 682 Fed.Appx. 721, 724 (11th Cir. 2017) -those issues are not presently before the Court.
Finally, GM briefly argues that, in light of the Grievance Settlement, the Complaint fails to state a claim on which relief *1056 can be granted because Gulley cannot show that the sole reason for any adverse action was in violation of Tenn. Code Ann. § 50-1-312(b). As already noted, however, Gulley may have to make a delicate fly cast into a stream blanketed with trees in establishing his claims, but a complaint need only "contain sufficient factual matter" to be "plausible," Iqbal, 129 S.Ct. at 1949, and a court "cannot dismiss for factual implausibility 'even if it [would] strike[ ] a savvy judge that ... recovery is very remote and unlikely.' " Courie v. Alcoa Wheel & Forged Prod., 577 F.3d 625, 629 (6th Cir. 2009) (quoting Twombly, 550 U.S. at 556, 127 S.Ct. 1955 ).
IV. Conclusion
For the foregoing reasons, GM's Motion to Dismiss (Doc. No. 8) will be denied. An appropriate Order will be entered.

In this regard, the statute provides:
If the employee satisfies th[e] burden [of establishing a prima facie case], the burden shall then be on the employer to produce evidence that one (1) or more legitimate reasons existed for the employee's discharge or adverse employment action. The burden on the employer is one of production and not persuasion. If the employer produces such evidence, the presumption of discharge, or adverse employment action, raised by the employee's prima facie case is rebutted, and the burden shifts to the employee to demonstrate that the reason given by the employer was not the true reason for the employee's discharge, or adverse employment action, and that the stated reason was a pretext for discharge or adverse employment action. The allocations of burdens of proof set out in this subdivision (b)(2) shall apply at all stages of the proceedings, including motions for summary judgment.
Tenn. Code Ann. § 50-1-312(b)(2).

Because the Court finds that Gulley's claims under state law are not preempted, the Court need not reach yet the question of exhaustion of remedies, or the failure to name the Union as a party.